IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

MOISES JIMENEZ,                          §
                                         §
        Petitioner,                      §
                                         §
v.                                       §        2:19-CV-221-Z-BR
                                         §   (criminal no. 2:16-CR-083-Z-BR)
UNITED STATES OF AMERICA,                §
                                         §
        Respondent.                      §

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
TO GRANT PETITIONER'S MOTION TO VACATE**

Before the Court is the *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct*

*Sentence by a Person in Federal Custody* filed by petitioner MOISES JIMENEZ. (ECF 2).[1]  For the

reasons set forth below, petitioner's motion should be GRANTED.[2]

## I.    BACKGROUND

On December 12, 2016, petitioner was charged by Indictment with three felony offenses:

Distribution and Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1),

(b)(1)(C) (Count I); Distribution and Possession with Intent to Distribute 500 grams or more of

methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(a)(viii) (Count II); and Possession of

a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count

---

[1] Record citations to petitioner's underlying federal criminal case, *United States v. Jimenez*, 2:16-CR-083-Z-BR, shall be to "CR ECF #" throughout this Opinion. Record citations to documents filed in the instant habeas case will be to "ECF #."

[2] The undersigned recommends in this Findings, Conclusion and Recommendation ("FCR") that petitioner's application for habeas relief be granted. The Court is cognizant of its duties under the Crime Victims' Rights Act ("CVRA") (18 U.S.C. § 3771) to allow any identifiable victim the right to be heard before the Court grants habeas relief; however, nothing in the underlying criminal case indicates that a named victim is involved in this case. To the extent that either party is aware that a named victim exists, such party *shall file notice with the Court within the time frame for objections to this FCR* so that a victim notification can occur and the opportunity to be heard can be provided.

III). *United States v. Jimenez,* No. 2:16-CR-083-Z-BR. (CR ECF 3). Christy Drake was appointed to represent petitioner in the criminal proceeding. (CR ECF 10). While represented by Christy Drake, the government conveyed an offer to the petitioner of ten years on a firearms charge. (CR ECF 15 at 3). Rather than accept the ten-year offer, petitioner absconded, and on April 17, 2017, an arrest warrant was issued for petitioner after he failed to appear for court proceedings. (CR ECF 29). The government then offered petitioner a new plea deal, that would allow him to plead guilty to the original ten-year offer on a firearms charge (capped at a ten-year maximum), in addition to a bail jumping charge (also capped at an additional ten-year maximum). (ECF 15 at 15-20). Petitioner was considering acceptance of this offer when he contacted attorney Ronald T. Spriggs. On June 13–14, 2017, after petitioner's family and girlfriend Laura had an initial meeting, petitioner hired Mr. Spriggs, and a motion to substitute counsel was granted. (CR ECF 37–38). On July 26, 2017, a Superseding Indictment was filed, adding an additional charge for Failure to Appear After Pre-Trial Release in violation of 18 U.S.C. § 3146(a)(1), (b)(1)(A)(i) (Count IV). (CR ECF 42). On the same day the Superseding Indictment was filed, trial was scheduled for August 21, 2017. (CR ECF 40).

On August 1, 2017, the original Assistant United States Attorney ("AUSA") on the case, Sean Taylor, was replaced by other AUSAs, Russell Lorfing and Sean Long. (CR ECF 45–46). On August 18, 2017, Mr. Spriggs docketed a late-filed Motion for Leave to File a Motion to Suppress. (CR ECF 58). The motion was denied, was then renewed and denied for a second time as untimely. (CR ECF 59, 61–62).

On August 21, 2017, petitioner's jury trial began. (CR ECF 69–72). The jury found petitioner guilty of the first three counts of the Superseding Indictment. (CR ECF 79). On September 1, 2017, petitioner filed a pro se Motion for a New Trial; by this motion, petitioner renewed his Motion to Suppress and Motion to Dismiss. (CR ECF 82). On October 26, 2017, a Presentence Report (PSR)

2

determined that petitioner's Guideline Imprisonment Range required the imposition of the mandatory minimum life sentence. (CR ECF 96). On January 2, 2018, petitioner filed a pleading objecting to the PSR. (CR ECF 100). On February 5, 2018, an Addendum to the PSR was filed, but the mandatory minimum sentence determination did not change. (CR ECF 102).

On February 12, 2018, the Court held petitioner's sentencing hearing. (CR ECF 109). At the hearing, the Court sentenced petitioner to 240 months for Count One, the mandatory term of life imprisonment for Count Two, and 60 months for Count Three to run consecutive to the other two sentences. (CR ECF 110). The Court entered Judgment on February 14, 2018. (*Id.*).

Petitioner, represented by Mitzi Mayfield, timely appealed his conviction and sentence to the United States Court of Appeals for the Fifth Circuit. (CR ECF 112). On December 31, 2018, the appellate court affirmed the judgment of the district court. *United States v. Jimenez*, No. 18-10208. (CR ECF 123–24).

On November 29, 2019, petitioner placed the instant motion to vacate his sentence in the prison mailing system, such motion being received and filed of record on December 5, 2019. (ECF 2). On October 16, 2020, the government filed its response in opposition to petitioner's motion. (ECF 14). On December 14, 2020, petitioner filed a reply to the government's response. (ECF 18). On May 19–20, 2022, the Court conducted an Evidentiary Hearing on petitioner's claims, and the hearing continued on July 14, 2022. (ECF 41–42, 58). Additional briefing was submitted by the parties in support of the evidentiary hearing. (ECF 48, 51).

## II.    PETITIONER'S ALLEGATIONS

In this motion to vacate, petitioner appears to argue both his conviction and sentence are in violation of the Constitution and laws of the United States for the following reasons:

Petitioner was denied effective assistance of counsel in his criminal proceeding because trial counsel:

3

a.    conducted an inadequate investigation of the criminal case and missed critical details and critical deadlines, including: the jurisdictional issue with the search warrant, the presence of a firearm, recorded confessions, jail phone calls, and the testimony of the apartment complex owner;

b.    gave poor and ineffective advice concerning the guilty plea offer from the government, including advice about the strength of the government's case, the strength (or weakness) of possible defenses, the existence of a civil lawsuit against the State of Texas, and the likelihood of the imposition of a mandatory life sentence;

c.    failed to timely file a Motion to Suppress, failed to request specific jury instructions, failed to file pretrial motions concerning the firearm, and failed to allege all grounds for suppression in a late-filed motion; and

d.    committed subornation of perjury from the petitioner with counsel's trial "strategy" and suggested defense.

(ECF 2 at 4–8; Appendix B at 4–8).

### III.    MERITS

In *Strickland v. Washington,* 466 U.S. 668, 689 (1984), the Supreme Court established a two-part test for analyzing ineffective assistance of counsel ("IAC") claims. The *Strickland* test requires a petitioner to demonstrate defense counsel's performance was both deficient and prejudicial. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

An attorney's performance is considered deficient if the attorney made errors so serious, he or she was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment to the United States Constitution. *Strickland*, 466 U.S. at 689. That is, counsel's performance must have fallen below the standards of reasonably competent representation as determined by the norms of the profession. A reviewing court's scrutiny of trial counsel's performance is highly deferential, with a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Id*.

A.    IAC – Inadequate Investigation by Trial Counsel

Petitioner's first claim is that trial counsel, Mr. Spriggs, provided ineffective assistance of counsel by his failure to conduct a reasonable investigation of the evidence involved in the case throughout his representation, thus compromising the advice petitioner received regarding the strength of the government's case at trial. (ECF 2 at 4).

The Sixth Amendment requires counsel "to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997). Strategic choices made after a thorough investigation of both the law and facts are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Even strategic choices made after a less than complete investigation are "reasonable" to the extent that reasonable professional judgments support the limitations on investigation. In determining the reasonableness of an attorney's investigation, this Court must directly assess a particular decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* The Court must also consider not only the evidence already known to counsel, but whether such evidence would lead reasonable counsel to investigate further.    *Wiggins v. Smith,* 539 U.S. 510, 526-27 (2003). The reasonableness of an investigation depends in large part on the information supplied by the defendant. *See Ransom*, 126 F.3d at 123. Counsel should, at a minimum, interview potential witnesses and independently investigate the facts and circumstances of the case. *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994). However, counsel is not required to investigate everyone mentioned by the defendant. *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985). A defendant who alleges counsel was deficient for failing to investigate "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

Here, Petitioner alleges that trial counsel wholly failed to investigate this case, even to the point of failing to review discovery provided by prior defense counsel and the government during the pretrial plea negotiations and trial preparation stage. (ECF 2 at 4–6). This failure to investigate resulted in counsel's failure to timely challenge the jurisdictional basis of the search warrant, failure to prepare a defensive trial strategy that addressed the videotaped confessions of the defendant, jail phone calls with admissions made by the defendant, testimony of the apartment-complex owner, the existence of a firearm, and the overall strength of the government's case.[3]  (*Id*.). Petitioner asserts that counsel was wholly unaware of critical evidence, provided directly to counsel during discovery by both prior defense counsel and the government. (*Id*.).

During the Evidentiary Hearing, trial counsel, Mr. Spriggs, testified concerning the discovery provided to him by former defense counsel Christy Drake and AUSA Sean Taylor. (ECF 49 at 116). Mr. Spriggs testified:

> "…When I first met Mr. Jimenez, everything and every piece of advice I gave him was based on what he had told me. I relied upon him to tell me what was going on in the case and the facts of the case."

(ECF 49 at 119).

As the criminal case proceeded towards trial, additional discovery was provided to Mr. Spriggs. Shortly after the motion to substitute counsel was granted in mid-June of 2017, Christy Drake provided her discovery file to Mr. Spriggs. (*Id*. at 135). When asked about the contents of that file, Mr. Spriggs testified:

> Q: So there was discovery in it?
> A: Yes, there was.

---

[3] These allegations are discussed in greater detail in Sealed Appendix A to this FCR. However, even absent any additional factual support for the undersigned's findings, conclusions, and recommendations (contained in the Sealed Appendix A), the undersigned finds that, based solely on the facts contained in this public FCR, a grant of habeas relief is appropriate under the *Strickland* standards. The facts contained herein support a finding of ineffective assistance of counsel and prejudice resulting from that ineffective assistance, during critical stages of the underlying criminal proceedings.

> Q: Were there law enforcement reports?
> A: I believe so.
> Q: Was there a search warrant?
> A: Later on, I found a search warrant in it, yes.

(*Id.* at 135). Further, Mr. Spriggs indicated that his review of the discovery provided at that time included "grabbing – grabbing a folder and going through the folder and seeing what's in there." (*Id.* at 136). The testimony indicates that the review was cursory and "just to make sure that it's what it's purported to be." (*Id.*). Mr. Spriggs estimated that he reviewed the discovery for "anywhere from 30 minutes to 45, somewhere around there." (*Id.* at 137).

As trial preparation and plea negotiations progressed from this initial discovery disclosure, Mr. Spriggs was not aware of facts and evidence contained within the provided discovery. First, the Court notes, and the government does not dispute, that the search warrant was contained in the discovery provided by Christy Drake to Mr. Spriggs. (ECF 33). The trial scheduling order entered on May 26, 2017 (CR ECF 36) set a motion deadline of July 17, 2017. Mr. Spriggs was provided a copy of the search warrant through Christy Drake's disclosures in mid-June. (ECF 33). However, Mr. Spriggs did not file a Motion to Suppress challenging the jurisdictional basis for the search warrant until August 18, 2017, only three days before trial was scheduled. (CR ECF 58). This certainly calls into question Mr. Spriggs's review of the discovery in even a cursory fashion.

AUSA Lorfing testified about his concerns regarding Mr. Spriggs's level of preparedness:

> Q:…You invited Mr. Spriggs to – it's been called a sit-down session or a meeting the day of the Pretrial Conference, and there were some witnesses there. Does that ring a bell to you?
> A: Yes…
> Q: What was the nature of that meeting?
> A: We were doing trial prep with some of the law enforcement witnesses…And it was the first time we were actually meeting with law enforcement, so it was a bit unusual to sit down as a first-time meeting with law enforcement and have defense counsel there.
> Q: It's a bit unusual to have defense counsel at a trial-prep meeting, right?
> A: In my experience, yes.

Q: Okay. Why would you invite a defense attorney to your trial-prep meeting with your witnesses?

A: You know, a couple of reasons. One is, I had gone to the [National Advocacy Center] before joining the U.S. Attorney's Office, and the United States Attorney of the Northern District, Chad Meacham, prior to being U.S. Attorney, was speaking, and he had mentioned this was a good strategy for two reasons. One, when you have defense counsel that maybe isn't prepared, and you have concerns about their preparation. And, two, to prevent that line of questioning at trial where defense attorneys, you know, where they say, you know, you've had a chance to meet with the prosecutor, and you've met with him, and you're their witness, and you've gone over them, but you've never met me before, right?

And so I thought it would be a good idea to circumvent that line of questioning, and also because I was concerned that maybe [Mr. Spriggs] wasn't as prepared as – as other defense attorneys.

(ECF 49 at 256–57). When questioned as to why AUSA Lorfing was concerned about Mr. Spriggs's

preparedness, AUSA Lorfing testified:

…Part of that was based on conversations with Sean Taylor in the transition of taking over that case, concerns that maybe Mr. Spriggs wasn't prepared, and that we should be careful in how we approach the case.

And then in my interactions with Mr. Spriggs, I had concern that perhaps he did not have a good grasp of all the evidence in the case.

(*Id*. at 258). AUSA Lorfing further elaborated,

…You know, at one point in our conversations, like, it might have been at the Pretrial Conference, or a couple of days before, it didn't appear that he knew that there were firearms that had been recovered.

He made it sound like he wasn't aware that there had been a confession made by his client. And, you know, I recall being in a room where we had all the evidence prepared, and Mr. Spriggs making a comment about being surprised that there was a confession. You know, my recollection is that, you know, it was kind of an informal conversation, but where we had mentioned, like man why is your guy going to trial? You know, there's a confession. You know, we got – we have your guy kind of red-handed. And Mr. Spriggs being, like, there's a confession?

And, you know, I wasn't sure if he was saying it in a joking manner or if he really didn't know that there was a confession there.

(*Id*. at 258–59). Based on AUSA Lorfing's experience, he did not believe Mr. Spriggs had a "good

grasp" of the evidence the week before trial began, or even during trial.

Q: And you were present at trial as lead counsel. Based on your observations at trial, are you able to say [whether Spriggs was] unprepared [at the Pretrial Conference] or

joking around?
A: I would – I would say unprepared.
…there was a myriad of things that I thought suggested he was unprepared…

(*Id*. at 259). AUSA Lorfing described Mr. Spriggs' trial preparation as "an overarching theme that he was unprepared" and acknowledged that Mr. Spriggs appeared to have no knowledge that a gun was involved in the case well after discovery was provided, and despite the original and superseding indictments' charges pertaining to the gun in question. (*Id*.; CR ECF 3, 42).

The undersigned finds based on the evidence and testimony that Mr. Spriggs failed to conduct an adequate, or even basic, investigation into the facts and evidence in this case. In fact, Mr. Spriggs was directly provided with evidence that he did not review. Such performance is certainly deficient and falls below a normal standard. In fact, his performance was such that even the government attempted to handle this case outside of its normal procedures—to account for a lack of preparation on the part of trial counsel.

The question then turns to prejudice. Typically, in cases alleging deficient performance during the investigation, prejudice turns on what the investigation would have revealed that altered the outcome of the proceedings. Most commonly, that means an additional defense that might have been presented at trial or raised during sentencing; here, however, the altered outcome is whether a thorough investigation might have altered either the advice given concerning the plea offer or the advice concerning the strength of the government's case. Thus, there is some cross-over in the Court's analysis here and the Court's analysis of prejudice under the petitioner's claim of ineffective assistance during the plea negotiation stage. Still, the Court considers first prejudice based on failure to investigate.

A failure to investigate the evidence led to several actions—or rather inactions—by Mr. Spriggs. First, Mr. Spriggs did not timely file a Motion to Suppress, because of his inadequate and

untimely review of the search warrant. Second, a failure to review petitioner's recorded confession before preparing a trial strategy clearly affected the advice concerning the strength of the government's case at trial. A lack of knowledge that a firearm existed is truly appalling in light of the charges, i.e. Count III, contained in both the Original Indictment and the Superseding Indictment.

Under the second prong of the *Strickland* test, petitioner must show "that there is a reasonable probability that, but for counsel's specified errors, the result of the proceeding would have been different." *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In order to establish prejudice under the second prong, petitioner must demonstrate that the attorney's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *United States v. Saenz-Forero*, 27 F.3d 1016, 1019 (5th Cir. 1994); *Carter v. Johnson*, 110 F.3d 1098, 1110 (5th Cir. 1997); *Murray*, 736 F.2d at 282.

Furthermore, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Therefore, in establishing prejudice, petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Here, counsel's errors resulted in the rejection of a plea offer that would have capped petitioner's sentence at a maximum of twenty years. Not only did these errors lead to convictions on three counts of the Superseding Indictment and a mandatory sentence of life imprisonment, but also led to a perjury finding against the petitioner at sentencing. Thus, the undersigned finds petitioner was also prejudiced by counsel's failure to adequately investigate this case.

B.    IAC – Plea Negotiations by Trial Counsel

"[T]he negotiation of a plea bargain is a critical phase of litigation for the purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 559 U.S. 356, 130 (2010). "When considering whether to plead guilty or proceed to trial, a defendant should be aware of the relevant circumstances and the likely consequences of his decision so that he can make an intelligent choice." *United States v. Rivas-Lopez*, 678 F.3d 353, 356-57 (5th Cir. 2012). "To establish an ineffective assistance claim, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's poor performance the result of the proceeding would have been different." *Id*. at 357. As to prejudice, when a defendant alleges that counsel's deficient performance caused him to reject a plea offer, he must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e. that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. *Lafler v. Cooper,* 566 U.S. 156, 163–64 (2012).

This Circuit has observed that providing counsel to assist a defendant in deciding whether to plead guilty is "'[o]ne of the most precious applications of the Sixth Amendment.'" *United States v. Rivas-Lopez*, 678 F.3d 353, 356–57 (5th Cir. 2012) (citing *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004) (alteration in original) (quoting *Reed v. United States*, 354 F.2d 227, 229 (5th Cir. 1965))). When considering whether to plead guilty or proceed to trial, a defendant should be aware of the relevant circumstances and the likely consequences of his decision so that he can make an intelligent choice. *Rivas-Lopez*, at 357 (citing *Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir. 1995) (a

28 U.S.C. § 2254 case)). Where a defendant persists in a plea of not guilty, counsel's failure to properly inform him about potential sentencing exposure may constitute ineffective assistance. *Id.* (citing *United States v. Ridgeway*, 321 F.3d 512, 514 (5th Cir. 2003), abrogated on other grounds as recognized in *Grammas*, 376 F.3d at 438). Any amount of additional jail time is significant for purposes of showing prejudice. *Grammas*, 376 F.3d at 439 (citing *Glover v. United States*, 531 U.S. 198, 203 (2001)).

When a defendant pleads guilty on the advice of counsel, the attorney has the duty to advise the defendant of the available options and possible consequences. *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981) (citing *Brady v. United States*, 397 U.S. 742, 756 (1970)). It is equally essential that the attorney advise a defendant of possible consequences where the defendant withdraws a negotiated guilty plea and stipulated sentence in the minimum range and instead stands trial and faces the maximum sentence. *Id.* at 267. To prove that counsel was ineffective, the defendant must demonstrate that the advice "was not within the range of competence demanded of attorneys in criminal cases." *Tollett v. Henderson*, 411 U.S. 258, 266 (1973) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

*Strickland* precedent in the context of plea negotiations is clear that a defendant must have "a full understanding of the risks of going to trial." *Anaya v. Lumpkin*, 976 F.3d 545, 552–53 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2703 (2021) (citing *Grammas*, 376 F.3d at 436). Otherwise, "he is unable to make an intelligent choice of whether to accept a plea or take his chances in court." *Id.* (quoting *Teague* 60 F.3d at 1171). "Plea negotiations are full of high stakes and hard choices." *Id.* "[H]aving competent counsel means being 'aware of the relevant circumstances and the likely consequences' of going to trial." *Id.* (citing *Rivas-Lopez*, 678 F.3d at 356. "Counsel is deficient when a defendant charges onward to trial 'with a grave misconception as to the very nature of the

proceeding and possible consequences.'" *Id.* (citing *Beckham*, 639 F.2d at 267).

On this note, trial counsel has a critical obligation "to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Anaya,* 976 F.3d at 553 (citing *Padilla*, 559 U.S. at 370). If a defendant cannot appreciate the extraordinary risks of passing up the government's offer, then under *Strickland's* performance prong, counsel's representation falls outside the "wide range of reasonable professional assistance." *Id*. at 553.

Generally, a very high level a deference is given to an attorney in determining reasonable professional assistance. However, there are certain standards that cannot be delegated to "strategy." Properly advising a client regarding a plea offer requires an attorney to provide reliable and accurate information regarding the choices before the defendant. This includes plea consequences, trial consequences, the strength of any defenses and a thorough understanding of the evidence in the case. Here, Mr. Spriggs' failure to familiarize himself with the evidence led to improper advice concerning accepting a guilty plea, especially in light of the possible, or rather likely, result after trial.

Petitioner was first represented by Christy Drake. During this representation, Ms. Drake determined that the petitioner was facing very serious drug and gun charges, with a possible sentence of 295 months for the drug charge, plus an additional 60 months for the firearms charge. (ECF 49 at 59). Additionally, Ms. Drake was aware that the petitioner could be subject to a career criminal enhancement under "section 851" that would render him subject to a mandatory minimum life sentence if convicted. (*Id.* at 59–60). After Ms. Drake's initial review of the evidence against petitioner, her assessment of the strength of the government's case was that "we would lose" if petitioner went to trial. (*Id*. at 60). The petitioner never denied responsibility or suggested the drugs or gun did not belong to him during Ms. Drake's representation. (*Id*. at 60–61).

Ms. Drake went to the AUSA, and requested the original ten-year capped offer to plead to

Felon in Possession of a Firearm. (*Id*. at 61). Ms. Drake testified,

> [Petitioner] was out on bond, and I got the plea papers, and he came in to visit about them. And I perceived that he was having a hard time thinking about going to jail for that length of time, even though I tried to explain that it was a very good offer. It was something I recommended, and that he was looking at much more time should he not take the plea offer.
> I think he found it a little overwhelming at the time and so he – he needed some time to think about it.

(ECF 49 at 62).

After Ms. Drake extended the ten-year offer to petitioner, he absconded and failed to appear for his next hearing with the Court. Petitioner was arrested on April 17, 2017, and Ms. Drake contacted the AUSA to determine if the ten-year offer was still available. (*Id*. at 76). At that time, AUSA Sean Taylor informed Ms. Drake that petitioner "could still plead to Felon in Possession of a Firearm if he also pleads to an additional bail-jumping charge." (*Id*. at 76–77). Thus, the current offer was "10+10" (Felon in Possession plus Failure to Appear/Bail Jumping). Ms. Drake met with the petitioner on May 23, 2017 and presented this offer to him, stating "he [was] very disappointed." (*Id*. at 80).

Ms. Drake testified that at the conclusion of the May 23, 2017 meeting, petitioner indicated he "wanted some time to think it over." (*Id*. at 81). Ms. Drake testified based on her experience she believed Senior Judge Fitzwater would have been receptive to the plea deal where petitioner would be capped at "10+10," and likely would have received a 13- or 14-year sentence after the guideline calculation was conducted on these charges. (*Id*. at 87). Most importantly, Ms. Drake recalled her last conversation with the petitioner before he hired new counsel.

> …when I went out – and I don't know; it was the last time I went out [to the jail] – and we visited about it [the plea offer] extensively. We were in the bigger parole room there, and we talked about it a lot. And he was still pretty frustrated about the whole situation.
> …
> A: He never denied responsibility for anything in my presence.

14

Q: Okay. So you were saying though he was still struggling with it: he was thinking it over?

A: He was really – he was having a hard time with it. He was struggling with it, and I felt like right at the end of the conversation that [he] was going to agree to it.

I think right as he walked out the door he said something along the lines: Okay. Okay, I'll do it.

And then I think it was pretty much the next time then Mr. Spriggs had been hired. That's how I recall it.

…

I felt like his exposure was just huge. I was very worried that he would not accept the plea offer, and that maybe things wouldn't end up as badly as they did but they would end up very poorly.

(*Id*. at 91–92). This powerful testimony indicates a willingness on the part of the petitioner to accept the plea offer when confronted with reasonable advice concerning the strength of the government's case and the likelihood of success of certain trial defenses. The government now argues that petitioner's hiring of Mr. Spriggs to gain a "second opinion" constituted a rejection of the plea offer and a demand to go to trial under any circumstances other than a probation offer. However, the undersigned views this evidence as a case of receiving ineffective assistance of counsel and ineffective advice at precisely the wrong time in the case. As Ms. Drake testified, there is a critical trust building stage between appointed counsel and the client where you slowly explain the circumstances and likelihood of success in a case:

Q: In your experience, there is some pushing required with the job, right?

A: You do at times need to be very forthright and explain what your [feelings are] about it and your experience has shown you in the past. And I tried to do that with Moises, but I felt that perhaps maybe I should have come across stronger.

Q: Feel guilty about it?

A: I do. I do. I feel bad about it. I feel bad about what happened to him.

Q: If you had stayed on the case, do you think he would have signed those plea papers?

A: I think he would have: I do.

(*Id*. at 92).

The petitioner also called expert witness Robert Webster to testify concerning the importance of proper advice during the plea negotiation stage. Mr. Webster testified as follows concerning the

duties to give *informed* advice during the plea negotiation stage:

> My understanding, my belief [is] that a lawyer must undertake an independent investigation as – when that lawyer assumes the reins of the case after a previous lawyer has stepped off, been removed, or otherwise substituted.
>
> …
>
> For proper counseling of the client on what his best options are. For trial strategy development. For witness preparation. For a variety of reasons, there must be a continuing investigation based on continuing evaluation.
>
> …
>
> Q: How important is it to evaluate the likelihood of conviction if the case should go to trial and advise the client accordingly?
> A: I think it's – I think it's paramount that an attorney in his responsibilities to the client brings all of his experience, all of his knowledge, all of his goodwill, if you will, in dealing with prosecutors with the evidence that's been presented to him, and what he has also been able to develop by way of investigation, to relay to the client the entire continuum of potential outcomes of a case, from, you know, miracle dispositions to ultimately grave dispositions if things do not go as hoped or as anticipated.

(ECF 49 at 293–95). Mr. Webster further testified that a thorough knowledge of the evidence is absolutely critical to providing advice on the defendant's options when considering a plea versus going to trial. For example, an investigation into the gun when a gun crime is charged (ECF 49 at 296) is "vital." It is also crucial to discuss with the client the viability of pretrial motions and any defenses. (*Id*. at 298). Further, knowing there is a confession in a case is "paramount" to a decision to go to trial. (*Id*. at 299). Where, as in this case, defense counsel is unaware of key evidence when advising petitioner, petitioner is prevented from understanding the full risks of going to trial and unable to make an informed decision.

The undersigned next considers the petitioner's subjective state of mind in refusing to accept the plea offer and whether that rejection was a direct result of trial counsel's deficient performance. During the continued Evidentiary Hearing, the petitioner presented evidence of jail phone calls and recordings solely to show his state of mind following conversations with his trial attorney concerning the strength of his case and his potential trial strategy. Petitioner testified at the hearing concerning

16

the effect of Mr. Spriggs' advice during the plea negotiations stage, in conjunction with presentation of jail phone calls between petitioner and family members. This testimony and evidence support the statements by Christy Drake that petitioner likely would have accepted or at least continued to negotiate regarding the plea offer "on the table" at the time Mr. Spriggs convinced petitioner to hire him as new counsel.

Petitioner also testified about his discussions with Christy Drake prior to hiring Mr. Spriggs. Specifically, Petitioner testified regarding the last plea offer "on the table" prior to her withdrawal from the case, as follows:

> Q: … you spoke with Ms. Drake, and she said, you really need to take this deal?
> A: Yes, sir.
> Q: Which you understood to be about a fourteen-year sentence –
> A: Yes, sir.
> Q: – if you took it? Okay, what did you tell Ms. Drake about that deal?
> A: I told her if she would – if there was a possibility to get something less, yeah, I'll take the plea bargain. And she said – because she had said that she could try to do something. I didn't understand what she meant though.
> …
> Q: Okay. So you told Ms. Drake you were going to take the deal?
> A: Yes, sir, I did.
> Q: Or did you tell her you were going to take the deal –
> A: I told her I'd take the deal. I just needed a couple of days to talk to my family.
> Q: Okay.
> …
> A: It was my understanding Ms. Drake was going to come back pretty soon. And I was talking to Pelon [another inmate], and I remembered his hearing here, and I asked him if his – if he was still being represented by that lawyer he had, and he said, yeah. I said, is he court appointed? He said, no he's paid. He goes that he paid him.
> And then I go: Well, about how much does he cost? And he – I think he said like $20,000. I went, well, I don't have that kind of money.

(ECF 61 at 34–36).

Petitioner later testified to his first conversation with Mr. Spriggs upon hiring him, stating that Mr. Spriggs suggested to petitioner that he had a very strong case to go to trial:

> Q: So regarding your state of mind after that first call with Spriggs – and you did discuss the fact that there had been a meeting with Laura, right? She told you that here

> had been a meeting?
> A: Yes, yes, yes.
> Q: Okay. – What did you believe about the strength of your case against the government at that moment?
> A: I believed I was going to win; that they were going to –
> Q: When you say you believed you were going to win, what did you think you were going to win?
> A: That they were going to end up dropping the charges.
> Q: And did you think that you were – it was just the case was going away, or did you think there would be more?
> A: Well, if it did – Mr. Spriggs did tell me that, if the government didn't drop the charge or work with me, that we could win at trial.

(ECF 61 at 46–47). Petitioner testified that he met with Mr. Spriggs in person on June 1st, and then petitioner's family agreed to pay for Mr. Spriggs to represent petitioner. (*See id*. at 51). At the evidentiary hearing, Petitioner testified to several phone calls following the decision to hire Mr. Spriggs and the decision to proceed to trial after hiring him. Specifically, petitioner testified:

> Q: And, again, you initially called Mr. Spriggs you said to get a second opinion –
> A: Yes, sir.
> Q: – on the plea offer that you had told Ms. Drake you were going to accept – right?
> A: Yes, sir.
> Q: And so the – your feelings about your case at this time on June the 4th, were they influenced by the advice that Mr. Spriggs gave you on that first phone call –
> A: Yes, sir.
> Q: – and on that meeting June 1st?
> …
> Q: Because he's the one who told you you had a good case, right?
> A: Yes, sir.

(ECF 61 at 61–62). Petitioner also testified at the evidentiary hearing about informing Ms. Drake that he was hiring Mr. Spriggs, as follows:

> Q: When you told her [Ms. Drake] you were thinking of hiring another lawyer, what – how did she respond?
> A: She was – she was upset. She told me that another lawyer wasn't going to do nothing [*sic*] for me, that to not let them take my money because it – I mean, they were not going to be able – the case was not going to go away.

(*Id*. at 63). While this testimony served as a warning to petitioner that the case was not likely to result in a positive outcome, the government argues that the prior advice by competent counsel mitigates

any ineffective representation during later plea negotiations by Mr. Spriggs. Nevertheless, this argument does not circumvent the very real prejudice caused by Mr. Spriggs telling petitioner exactly what he wanted to hear – against the great weight of the evidence – at a critical junction of the representation by Ms. Drake, thus negating her ability to positively influence the outcome of the case with competent advice regarding plea negotiations.

During discussions with Mr. Spriggs regarding proceeding to trial versus accepting a guilty plea, Mr. Spriggs suggested several "defenses" in direct contradiction to evidence that was available during discovery and later presented at trial. For instance, testimony at the evidentiary hearing revealed that petitioner was not on the lease for the apartment unit where the search warrant was executed, but petitioner knew the apartment complex manager was aware that petitioner lived there; additionally, recorded jail phone calls following his initial arrest reveal details of conversations where petitioner admits to living in the apartment and to selling drugs out of it (by having additional drug money stored in the apartment). (*See id*. at 68). This same evidence also negated Mr. Spriggs' proposed defense that the government could not prove the drugs belonged to petitioner because of a lack of other physical evidence. (*See id.* at 73).

Petitioner testified as follows about his conversations with Mr. Spriggs regarding continued plea negotiations:

> Q: Did he [Mr. Spriggs] recommend that you accept the plea offer at that time?
> A: No, sir, he didn't.
> Q: What did he say about the plea offer?
> A: We talked again about the – the defense that we had, and he – he told me we had a really strong defense.

(ECF 61 at 75–76). Additionally, it was at the July 20th meeting that petitioner first learned that his trial was scheduled in only three weeks, on August 14, 2017. (ECF 61 at 77). The offer to plead guilty to two different counts with ten-year caps on each count was still on the table at the July 20th meeting,

but petitioner was informed that the government was enhancing petitioner's sentencing range to a mandatory life sentence if he proceeded to trial and was convicted. (*See id*. at 68–75). Despite this knowledge, based on the representations of Mr. Spriggs, petitioner continued to reject the plea offer despite his prior willingness to consider it and despite his repeated videotaped confessions to the crime. This behavior supports petitioner's testimony that the advice of Mr. Spriggs caused petitioner's grave misconception of the potential consequences of going to trial and substantially affected the outcome of his case. The government has generally conceded throughout the evidentiary hearing that Mr. Spriggs' advice was deficient—but argued that Ms. Drake's good advice counterbalanced any later deficient advice. The undersigned is not persuaded by this reasoning. The question is whether the ineffective representation by Mr. Spriggs ultimately affected the outcome of this case. Because Mr. Spriggs' comments completely undermined Ms. Drake's advice and rendered it void in the mind of the petitioner, that answer is yes.

C.   IAC – Trial Counsel's Failure to File Motion to Suppress and Other Pretrial Motions

Petitioner contends trial counsel was also deficient for failing to timely file a motion to suppress. The government in effect conceded that petitioner's counsel performed in a deficient manner in missing deadlines in the criminal trial scheduling order. (ECF 61 at 158). This circuit has held that a claim of ineffective assistance based on a failure to file a motion to suppress cannot be reviewed without testimony as to the reasons behind failing to file the motion. *United States v. Maria-Martinez*, 143 F.3d 914, 916 (5th Cir. 1998) (citing *United States v. Chavez-Valencia*, 116 F.3d 127, 133–34 (5th Cir.), *cert. denied*, 522 U.S. 926 (1997)).

A claim of ineffective assistance of counsel based on a failure to raise a motion to suppress is governed by the two-pronged *Strickland* test. *Strickland*, 466 U.S. 668, 687 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the

ineffectiveness claim." *Id*. at 700. As required by the first prong, petitioner identified an act or omission of his trial counsel that he alleges was not the result of reasonable professional judgment— his trial counsel's failure to file a *timely* motion to suppress the narcotics found at his apartment pursuant to a search warrant. *See id*. at 690. In response, the district court must then determine whether "the identified acts or omissions were outside the wide range of professionally competent assistance" considering all of the circumstances at the time of trial counsel's conduct. *Id*.

To meet the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Because trial counsel's failure to raise a Fourth Amendment claim is at issue, "the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Here, Mr. Spriggs provided no satisfactory explanation for his failure to timely file a Motion to Suppress; rather, he simply argued he did not find the search warrant in the discovery before the deadline in the scheduling order. Mr. Spriggs listed no other efforts to obtain the search warrant nor any attempts to continue the scheduling order before deadlines had passed. (ECF 49 at 137–40). Thus, Mr. Spriggs performance was clearly deficient.

The question then becomes whether the petitioner was prejudiced by the deficient performance, which is a question about the merits of the Motion to Suppress. Petitioner argues there was a question concerning the jurisdiction of the state court judge who signed the search warrant. Even were the warrant impermissibly issued under Texas law, suppression would not be warranted for purposes of the Fourth Amendment of the U.S. Constitution. United States Supreme Court

decisions regarding the Fourth Amendment are not necessarily binding on the interpretation of section 9 of the state constitution. *See e.g., Heitman v. State*, 815 S.W.2d 681, 682, 690 (Tex. Crim. App. 1991). "[I]t is possible that section 9 provides more protection to Texas citizens than the Fourth Amendment does. However, Texas courts have rejected claims that the protections of the Texas Constitution exceed those of the Fourth Amendment when no authority is argued or provided for such an interpretation." *See, e.g. Gates v. Texas Dept. of Protective & Regulatory Servs.*, 537 F.3d 404, 437–38 (5th Cir. 2008) (citing *Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993)).[4]

Additionally, the information provided in the record does not support that a Motion to Suppress was likely to succeed on the merits, nor does it support that a good faith exception would not apply if there was a deficiency in the execution of the warrant. As the Motion to Suppress was insupportable and unlikely to succeed, the undersigned finds that the petitioner was not prejudiced by the failure to timely file a Motion to Suppress. Even though trial counsel's performance in failing to file such motion was deficient, any allegations that such Motion could be used to negotiate a "better" plea deal for the petitioner is unsupported by the record given the government's continuing stance on

---

[4] Moreover, as this is a federal court, the admissibility of evidence is governed by federal law. *See, e.g., United States v. Walker*, 960 F.2d 409, 415 (5th Cir. 1992) ("The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution."); *Burge v. Estelle*, 496 F.2d 1177, 1178 (5th Cir. 1974); *United States v. Wicks*, 115 Fed. Appx. 648, 649–50 (5th Cir. 2004) (not designated for publication) (citing *Walker*). Several circuits hold that a procedural violation of state law in securing a warrant should not result in suppression. *See, e.g., United States v. Castillo*, 449 F.2d 1300, 1301 n.2 (5th Cir. 1971); *United States v. Gilbert*, 942 F.2d 1537 (11th Cir. 1991) (declining to suppress evidence even though the search warrant did not comply with Florida law because it did not offend constitutional principles); *see also United States v. Sims*, 103 F.3d 125, at *4 (5th Cir. 1996) (not designated for publication) (holding that a failure to affix a return date on the face of the warrant, allegedly required by Mississippi law, did not render the search unconstitutional); *United States v. Franklin*, 284 Fed. Appx. 266 (6th Cir. 2008) (upholding that a search conducted pursuant to a warrant issued by a magistrate allegedly acting without jurisdiction because there was no showing that the magistrate was not neutral and detached) (not designated for publication); *cf. United States v. Scott*, 260 F.3d 512 (6th Cir. 2001) (suppressing evidence collected from a search warrant issued by a retired judge who had no legal authority to issue search warrants). In addition, the Supreme Court recently held that, because "state restrictions do not alter the Fourth Amendment's protections," searches undertaken pursuant to an arrest are constitutional even if state law would have forbidden the defendant's arrest. *See Virginia v. Moore*, 553 U.S. 164 (2008). Thus, even if there was a procedural error in the execution of the search warrant, it does not follow that the evidence here would have been suppressed.

the merits of such a motion. Additionally, petitioner wholly failed to indicate how the filing of any other pretrial or trial motion would have been meritorious or resulted in a different outcome in these proceedings.

D.     IAC – Trial "Strategy" and Committing Subornation of Perjury

Petitioner further argues that Mr. Spriggs' "trial strategy" involved contradictory and logically insupportable defenses and further encouraged the petitioner to testify and commit perjury to support an actual innocence defense.

A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)). The question then becomes whether a trial strategy can be "informed" if not supported by a thorough knowledge of the evidence that may be presented at trial and a discussion of that evidence with the petitioner.

Here, the undersigned has found that counsel was deficient in preparing for trial and investigating the evidence in this case. As such, counsel did not present petitioner with the consequences of his choice to testify and to specifically testify that he was not the owner of the drugs or gun in question, when all previous (recorded) statements made by petitioner acknowledged his ownership of the drugs and guns and acknowledged his guilt of the crimes. Thus, trial counsel's recommendation for petitioner to testify to his innocence despite recorded confessions, and to present two contradictory theories of the case, was not sound strategy; instead, it directly contradicted all of the other substantial evidence. Such "strategy" permeated the trial with obvious unfairness, even recognized by the government during the trial preparation session to which Mr. Spriggs was invited.

E.     Remedy

The undersigned now turns to the question of an adequate remedy to cure the deficient performance and resulting prejudice.

Remedies for violations of the Sixth Amendment "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). At the end of the day, the court must look for a remedy that will "'neutralize the taint' of a constitutional violation." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (quoting *Morrison*, 449 U.S. at 364).

Here, petitioner was on the cusp of accepting an offer for "10+10" years (a total cap of 20 years) when Mr. Spriggs signed on to this case and began advising petitioner in a deficient fashion. The undersigned views this as receiving the worst possible advice at the worst possible time. Thus, an appropriate remedy is the vacate the conviction and sentence (because the plea offer was for different criminal charges) and require the government to offer the petitioner the same plea offer on the table at the conclusion of the representation by former defense attorney Christy Drake.

## IV.     RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* filed by petitioner MOISES JIMENEZ be GRANTED. Further, the undersigned recommends that petitioner's convictions be VACATED for all three counts, and that petitioner be offered the opportunity to plead to the plea offer last presented to petitioner, to wit: Felon in Possession of a Firearm (10-year statutory cap) and Failure to Appear after Pre-trial Release (10-year statutory cap) (a/k/a/ the "10+10" offer). There is no obligation by the government to offer any 5K reduction or other incentives to lower the petitioner's sentencing exposure.

## V.   INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a file marked copy of the Findings, Conclusions and Recommendation to petitioner and to each attorney of record by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED January 18, 2023.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation.   In the event parties wish to object, they are hereby NOTIFIED that the deadline the written filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.   Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).   **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.   *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation."   Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.   A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.   *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).